Case No. 3:21-cv-01895-D

## THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

In re: HIGHLAND CAPITAL MANAGEMENT, L.P.,

Reorganized Debtor.

HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., NEXPOINT ADVISORS, L.P., and THE DUGABOY INVESTMENT TRUST,

Appellants,

v.

HIGHLAND CAPITAL MANAGEMENT, L.P.,

Appellee.

On Appeal from the United States Bankruptcy Court
for the Northern District of Texas, Case No. 19-34054-sgj11
Hon. Stacey G. C. Jernigan

## APPELLEE'S MOTION TO DISMISS APPEAL AS EQUITABLY MOOT

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

Appellee Highland Capital Management, L.P. ("Debtor" or "Highland"), respectfully moves this Court to dismiss as equitably moot Appellants' appeal from the Bankruptcy Court's *Order Approving Debtor's Motion for Entry of an Order (I) Authorizing the (A) Creation of an Indemnity Subtrust and (B) Entry into an Indemnity Trust Agreement and (II) Granting Related Relief* (the "Order").[1]

## **PRELIMINARY STATEMENT**

This Circuit has long recognized that there are circumstances in which appellate courts can no longer equitably "order fundamental changes in reorganization cases." *Hilal v. Williams* (*In re Hilal*), 534 F.3d 498, 500 (5th Cir. 2008) (quoting *Manges v. Seattle-First Nat'l Bank (In re Manges)*, 29 F.3d 1034, 1039 (5th Cir. 1995)). That doctrine of equitable mootness safeguards third parties' reasonable reliance on an unstayed bankruptcy court's order and avoids value-destructive attempts to unwind the many intricate transactions that take place in reliance on those orders. While the doctrine is most commonly applied to an appeal of a confirmation order, it may apply in other contexts when unraveling a bankruptcy court's order would imperil the rights of third parties or the success of a chapter 11 plan.

---

[1] Concurrently herewith, Highland is filing the *Appendix in Support of Appellee's Motion to Dismiss Appeal as Equitably Moot* (the "Appendix"). Citations to the Appendix are notated as follows: Ex. #, Appx. #. The Order is Ex. 1, Appx. 1-4.

On February 22, 2021, the Bankruptcy Court entered the Confirmation Order[2] confirming Highland's Plan.[3]   The Plan contemplates the monetization of Highland's assets using a governance structure that leverages the substantial knowledge and experience of the independent parties installed during the bankruptcy case (the "Independent Managers") to oversee the monetization.  Because of the frivolous and vexatious litigation of Highland's founder, James Dondero,[4] the Independent Managers would not work for the Reorganized Debtor without assurance that their indemnification rights, which are senior to creditor claims, would be honored.   Accordingly, the Effective Date of the Plan was conditioned on, among other things, the procurement of directors and officers insurance ("D&O Insurance").  Despite extensive efforts to source coverage, the Debtor was unable to obtain reasonable D&O Insurance because of the litigation history and adversarial relationship with Mr. Dondero.

In lieu of D&O Insurance, Highland decided to create an indemnity trust (the "Indemnity Trust") to secure the various indemnification obligations under the Plan.

---

[2] "Confirmation Order" means the *Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief*. Ex. 2, Appx. 5-166.

[3] "Plan" means the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)*, including certain amendments filed on February 1, 2021.  Ex. 3, Appx. 167-233. All capitalized terms used but not defined herein have the meanings given to them in the Plan.

[4] Mr. Dondero's litigiousness has resulted in nearly twenty open litigation matters in the Bankruptcy Court, this Court, Texas state court, and the Fifth Circuit Court of Appeals.

The Independent Managers agreed to accept their positions if the Bankruptcy Court approved the Indemnity Trust.  Accordingly, Highland filed the Indemnity Trust Motion[5] and disclosed that it would waive the condition to the Effective Date that required D&O Insurance and go effective *only* if the Indemnity Trust were approved. The Indemnity Trust Motion was granted, and the Plan went effective on August 11, 2021.

Appellants, however, now seek to overturn the creation of the Indemnity Trust and effectively put the Independent Managers' indemnification rights at risk and cause the Independent Managers to resign, thereby preventing the substantially consummated Plan from succeeding.  Jeopardizing the Plan at this stage is not a viable option.  Appellants' appeal is equitably moot, and all three factors used to evaluate equitable mootness favor dismissal of the appeal.

*First*, there is no dispute that Appellants did not obtain a stay of the Order pending appeal; they did not seek one.  Appellants also failed to obtain a stay of the Confirmation Order, which they implicitly challenge.[6]  Appellants, and the other

---

[5] "Indemnity Trust Motion" means *Debtor's Motion for Entry of an Order (i) Authorizing the (a) Creation of an Indemnity Subtrust and (b) Entry into an Indemnity Trust Agreement and (ii) Granting Related Relief.* Ex. 4, Appx. 234-260.

[6] The only parties appealing the Confirmation Order are James Dondero, Appellants, and certain other entities Mr. Dondero owns and/or controls (collectively, the "Dondero Entities").  Ex. 2, Appx. 25.

DOCS_NY:44238.9 36027/003

Dondero Entities, requested a stay, but failed to satisfy any court that they met the standards for obtaining temporary relief from the Bankruptcy Court's order.

*Second*, the Plan *has* gone effective and *has* been substantially consummated. Since the Effective Date, there has been a flurry of activity consummating the Plan. New legal entities have succeeded the Debtor. A third party, with no prior role in the case, has infused $45 million in exit financing into the reorganized entities and done so based upon the expectation that the Independent Managers would oversee the monetization. And significant distributions have already been made to numerous creditors—including sizable payments to settle previously outstanding, but now resolved, litigation against the estate.

*Finally*, requiring Highland to modify the Plan at this stage would materially harm third parties and jeopardize the Plan's success. Granting the appeal would jeopardize the Independent Managers' indemnification rights if they are sued for actions taken, and to be taken, to implement and consummate the Plan. As discussed below, indemnification in this case is exceedingly important. The risk of frivolous and vexatious litigation from Appellants, Mr. Dondero, and other entities owned and controlled by Mr. Dondero, is real (and already occurring). The Independent Managers would not have accepted their roles or taken steps to consummate the Plan without the Indemnity Trust, and they will resign without the protections afforded by the Indemnity Trust. Without these individuals, Highland will be rudderless, and

Highland's general unsecured creditors' (99.8% in amount of which voted for the Plan) receipt of distributions on their claims will be placed in serious jeopardy.

Eliminating the guarantee that the indemnification rights will be honored, a guarantee relied on by the Independent Managers and a condition to Plan effectiveness, would cause chaos to the substantial and irreversible detriment of all parties who have relied on the Plan and Confirmation Order.  The Court should dismiss this appeal as equitably moot.

## **BACKGROUND**

As the Bankruptcy Court aptly recognized, this is anything but a "garden variety Chapter 11 case."[7]  Ex. 2, Appx. 11.  Highland, a registered investment advisor responsible for a complex web of funds and portfolios, was not pushed into bankruptcy by high loan debt, depressed cash flows, or any of the other usual reasons that companies find themselves in financial trouble.  *Id.*, Appx. 13-14.  Rather, Highland was compelled to seek bankruptcy protection because of an onslaught of litigation and judgments against it resulting from its history as an aggressive "serial litigator."  *Id.*, Appx. 14.  Indeed, nearly all of Highland's major creditors were either entities that held awards or claims against it or vendors or attorneys that worked for

---

[7] A comprehensive summary of Highland's bankruptcy case and related background facts is found in Appellee's Brief on the merits of the appeals filed contemporaneously with this motion.

Highland during its various litigation campaigns but had not been paid.  *Id.*, Appx. 16.

Highland's litigious history foreshadowed its litigious bankruptcy.  Indeed, Mr. Dondero[8] threatened to "burn the place down" if he didn't get his way during plan negotiations.  *Id.*, Appx. 58.  He did not get his way, and since then he and his related entities, including Appellants, have challenged every jot and tittle through (and beyond) confirmation of Highland's reorganization Plan.  *Id.*, Appx. 61-62.[9]

Nevertheless, with the assistance of accomplished bankruptcy mediators, Highland and its key constituencies settled their differences and agreed on the terms of Highland's reorganization.  *Id.*, Appx. 20-21.  In a resolution that the bankruptcy court called "nothing short of a miracle," Highland's Plan proposed to form a Claimant Trust and Litigation Sub-Trust to manage and sell assets, and pursue claims against, among others, Appellants, over the period of time necessary to accomplish its tasks for the benefit of Highland's creditors (including its many

---

[8] Mr. Dondero was removed (with his agreement) from his control positions with the Debtor effective January 9, 2020 at the request of the Unsecured Creditors' Committee (the "Committee") and the U.S. Trustee who were concerned about the Debtor's ability to act as a fiduciary because of Dondero's well-known history of self-dealing, fraud, and other misconduct.  On that date, the Bankruptcy Court approved a corporate governance settlement which created both an independent board of directors and well as certain operational protocols.  *Id.*, Appx. 16-18.

[9] This pattern of harassment has continued post-confirmation.  Since confirmation, additional lawsuits have been filed by Appellants and the other Dondero Entities, among other actions filed by still other Dondero-related entities, and Highland has been forced to defend against actions taken by Dondero and other Dondero-related entities with contempt motions, which have been granted.  Exhibit 5 (Appx. 261-275) to the Appendix lists the substantial litigation involving Mr. Dondero and Highland in furtherance of his strategy of harassment.

litigation adversaries). *Id.* That settlement and the resulting Plan allowed Highland to avoid a free-fall liquidation and fire-sale of its assets that would have been to the detriment of all its creditors. Not surprisingly, creditors holding 99.8% of the value of the general unsecured claims against Highland supported the Plan. *Id.*, Appx. 11.

To ensure the Plan's success, end the constant litigation, and allow Highland's successors to focus on maximizing creditor distributions through an orderly monetization of its assets, the Plan (i) enjoined actions designed to interfere with the Plan's implementation and consummation (the "Injunction"), (ii) exculpated certain parties for their acts taken in support of the Plan that were not grossly negligent, taken in bad faith, willful, or criminal (the "Exculpation"), and (iii) required the Bankruptcy Court to pre-approve certain lawsuits against Highland's successors and other bankruptcy participants as being colorable before they could be filed and proceed in whatever court would have jurisdiction over such claims (the "Gatekeeper Provision"). *See generally* Ex, 2, Appx. 53-30; Ex. 3, Appx. 221-223; 224-225. These three "Plan Protections," the Bankruptcy Court found, are "integral elements of the transactions incorporated into the Plan"; "inextricably bound with the other provisions of the Plan"; and "confer material benefits on, and are in the best interests of, the Debtor, its Estate, and its creditors." Ex, 2, Appx. 53-54.

Although Highland was able to resolve most parties' objections to its Plan prior to confirmation, the Dondero Entities (including Appellants) persisted in

challenging the Plan Protections and certain other key plan provisions. The Bankruptcy Court held a two-day evidentiary hearing, after which it denied the Dondero Entities' objections and entered an order confirming the Plan on February 22, 2021. *See generally Id*. In doing so, the bankruptcy court acknowledged Mr. Dondero as a "serial litigator" who owns or controls Appellants and the other Dondero Entities, each of which is "marching pursuant to the orders or Mr. Dondero." *Id.*, Appx. 25. The Bankruptcy Court explicitly questioned the Dondero Entities, including Appellants', "good faith" in objecting to the Plan, especially given the "noteworthy" "remoteness of their economic interests" in the issues they were raising and in the estate more generally. *Id.*, Appx. 22-23. The Bankruptcy Court explained that, based on the record, it had "good reason to believe that these parties are not objecting to protect economic interests they have in the Debtor but to be disruptors." *Id.* The mere fact that Mr. Dondero "wants his company back," the court emphasized, "is not a good faith basis to lob objections to the Plan." *Id.*, Appx. 23.

The Dondero Entities, including Appellants, appealed,[10] and sought a stay of the Confirmation Order from the Bankruptcy Court,[11] the District Court[12] and this

---

[10]  D.I. 1957, 1966, 1970, and 1972.

[11]  D.I. 1955, 1967, 1971, and 1973.

[12]  District Court Case Nos. 3:21-cv-550 (Docket No. 5); 3:21-cv-538, 3:21-cv-539 and 3:21-cv-546 (consolidated).

DOCS_NY:44238.9 36027/003

Court.[13]  Every court from which the Dondero Entities sought a stay nevertheless denied their applications and permitted the Plan to go effective and be consummated.[14] [15] [16]

One of the conditions to the Effective Date was the procurement of D&O Insurance to protect the Independent Managers against Mr. Dondero's frivolous and vexatious litigation by guaranteeing a source of recovery for potential indemnification claims, including defense costs.  Ex. 2, Appx. 19-20.  The Independent Managers were unwilling to assume their positions if there was a risk that the Claimant Trust, the Reorganized Debtor, or the Litigation Sub-Trust would be unwilling or unable to satisfy their indemnification obligations under the Plan (the "Indemnification Obligations"), which obligations were senior to prepetition Claims against Highland.  However, following entry of the Confirmation Order, Highland encountered difficulty obtaining reasonable D&O Insurance precisely because of the insurance industry's familiarity with Mr. Dondero's vast history of litigation, his litigiousness in Highland's bankruptcy, and the threat that he (and his controlled entities) would continue litigating anything and everything well beyond the Effective Date.

---

[13]  Fifth Cir. Case No. 21-10449, Document 515869234.

[14]  D.I. 2084 and 2095.

[15]  Fifth Cir. Case No. 21-10449, Document 515906886.

[16]  District Court Case Nos. 3:21-cv-550, Docket No. 18.

To enable the Plan to become effective, Highland, working closely with the Committee, began investigating alternatives to traditional D&O Insurance and determined the creation of the Indemnity Trust was the most attractive alternative. The Indemnity Trust was structured as a special purpose vehicle – capitalized by the Reorganized Debtor – that would secure the Indemnification Obligations.

Although D&O Insurance was a condition to the Effective Date, Highland disclosed to the Bankruptcy Court that it would waive that condition *only* if the Indemnity Trust were approved as it would fill the gap and provide the Independent Managers the assurance they needed to implement and consummate the Plan.

On June 25, 2021, Highland, with Committee support, filed the Indemnity Trust Motion[17] seeking authority to create and fund the Indemnity Trust. Appellants were the only parties to object to the Indemnity Trust Motion. The Bankruptcy Court rejected Appellants' challenge and entered the Order. Appellants appealed but did not seek a stay of the Order.

Because the Indemnity Trust Motion was granted, the Indemnity Trust was created and funded, and Highland's Plan went effective on August 11, 2021. Since

---

[17] The Indemnity Trust does not change the amount or priority of distributions under the Plan. Highland reserves all rights it may have to challenge Appellants' appeal of the Order, and nothing herein shall be deemed a waiver of such rights.

11

the Effective Date, numerous transactions and events have taken place, including the creation and funding of the Indemnity Trust.[18]

For example, a $45 million exit facility with Blue Torch Capital ("Blue Torch") has been consummated (the "Exit Facility"), under which Blue Torch has already funded (i) a $25 million term note issued by the Reorganized Debtor and (ii) a $20 million term note issued by a portfolio company indirectly owned by the Reorganized Debtor (the "Portfolio Company"). Blue Torch provided the Exit Facility with the understanding that the Independent Managers would be around to oversee the monetization of Highland's assets. Moreover, all claims required to be paid on the Effective Date (approximately $2.2 million) have been paid and distributions totaling $5.1 million have been paid to holders of allowed Convenience Class Claims. And Highland has assumed contracts necessary for the Reorganized Debtor's and Claimant Trust's operation—including contracts under which they manage 20 collateralized loan obligations with approximately $700 million in assets—and made cure payments in the amount of $525,000 to the applicable counterparties.

In addition, as set forth in the *Declaration of James P. Seery, Jr.* (the "Seery Declaration") (Ex. 6, Appx. 276-287), filed in support of this Motion:

---

[18] While the Plan has been substantially consummated, the process of monetizing assets continues and is anticipated to result in substantial distribution to Highland's general unsecured creditors.

- The Debtor's prepetition limited and general partnership interests have been cancelled and cease to exist and the post-petition court-approved independent directors have resigned.

- A Claimant Trust has been established as a Delaware liquidating trust, and new limited partnership interests have been issued to the Claimant Trust as the sole limited partner of the Reorganized Debtor.

- HCMLP GP LLC ("New GP") has been incorporated as a wholly owned subsidiary of the Claimant Trust, and is the Reorganized Debtor's general partner.

- All of the Debtor's former assets have been transferred to the Reorganized Debtor or to the Claimant Trust, as applicable.

- The Reorganized Debtor obtained a new EIN as of the Effective Date, employs 12 people under employment contracts and is withholding taxes under the new EIN.

- James P. Seery, Jr., has been appointed the Reorganized Debtor's chief executive officer and the Claimant Trustee of the Claimant Trust and oversees the operations and management of the Reorganized Debtor and Claimant Trust.

- The Claimant Trust's owners are the Claimant Trust Beneficiaries, comprised of the holders of Class 8 and Class 9 claims under the Plan.

- The Claimant Trust Oversight Committee ("Oversight Committee") has been appointed to manage and oversee the Claimant Trust and consists of designees of two of the largest creditors of the Debtor and a third independent director with no prior involvement with Highland or the bankruptcy case.

- A Litigation Sub-Trust also has been created, as a sub-trust of the Claimant Trust, and Marc Kirschner has been appointed as the Litigation Trustee. Mr. Kirschner is a senior managing director at Teneo, and had no involvement with Highland prior to his 2021 retention as a litigation consultant to the Committee. Mr. Kirschner is actively investigating the Debtor's causes of action and anticipates filing lawsuits on such causes of action on or before October 16, 2021.

- The ownership of certain Estate Claims, as defined in the Plan, has been transferred to the Litigation Sub-Trust.

- The Indemnity Trust has been established as a special-purpose-vehicle collateral trust to secure any obligations to indemnify claims that arise against the Reorganized Debtor, Claimant Trust, Litigation Sub-Trust, Claimant Trustee, Litigation Trustee, or Oversight Committee members.

- The Indemnity Trust has been funded with $2.5 million cash from the Reorganized Debtor and a note issued by the Reorganized Debtor, the Claimant Trust, and the Litigation Sub-Trust in an amount equal to $25 million less the value of assets held by the Indemnity Trust.

- The Exit Facility is fully guaranteed by the Reorganized Debtor, the Claimant Trust, and the Reorganized Debtor's material operating subsidiaries and secured by substantially all of those guarantors' assets.

- The $5.1 million already paid to unsecured creditors holding allowed Class 7 Convenience Claims represents 77% of all Class 7 claims filed. The process of resolving and paying additional Convenience Claims is ongoing.

- All claims required to be paid in cash on the Effective Date have been paid. These claims totaled approximately $2.2 million in the aggregate and included a cash payment to major litigation creditor Acis as required under the Acis settlement agreement.

- Class 2 secured creditor Frontier State Bank ("Frontier") has been paid all accrued and unpaid interest outstanding on the Frontier note in the approximate amount of $500,000, and the Reorganized Debtor has issued the New Frontier Note to Frontier in the principal amount of approximately $5.2 million secured by approximately $23 million of the Reorganized Debtor's assets.

- Payments in the aggregate amount of $165,412 have been made to holders of Other Secured, Priority Non-Tax and Priority Tax Claims.

- Due to the occurrence of the Plan's effective date, Jefferies, a secured creditor of Highland, has withdrawn its claim against the Debtor.

Mr. Seery also makes clear in his Declaration that, because of Mr. Dondero's litigiousness, Mr. Seery and the other Independent Managers would not have agreed to (i) serve, respectively, as the chief executive officer of the Reorganized Debtor, the Claimant Trustee, the Litigation Trustee, or as members of the Oversight Committee or (ii) assist in carrying out the transactions contemplated by the Plan in each case without the Indemnity Trust and will not remain in those roles unless the Indemnity Trust remains in existence.[19]

Despite third-party reliance on the Indemnity Trust and the substantial consummation of the Plan, Appellants argue that the Indemnity Trust should be undone and that the Independent Managers who relied on the Indemnity Trust to consummate the Plan should be without any assurance that the Indemnification Obligations owed to them will be fulfilled.

## ARGUMENT

A bankruptcy appeal "is equitably moot" whenever the plan "has been so substantially consummated that a court can order no effective relief even though there may still be a live dispute between the parties." *TNB Fin., Inc. v. James F. Parker Interests (In re Grimland, Inc.)*, 243 F.3d 228, 231 (5th Cir. 2001). The Fifth

---

[19] Mr. Seery's concerns regarding Mr. Dondero's litigiousness are not just theoretical. Mr. Dondero, through his controlled entities, has actively sought to sue Mr. Seery for actions taken during the bankruptcy both directly and indirectly in this Court and in others. *See* Ex. 5, Appx. 266. These actions resulted in the Bankruptcy Court holding Mr. Dondero, among others, in contempt. *In re Highland Capital Mgmt., L.P.*, 2021 Bankr. LEXIS 2074 (Bankr. N.D. Tex. Aug. 3, 2021).

15

Circuit has repeatedly emphasized that "there is a point beyond which [appellate courts] cannot order fundamental changes in reorganization cases." *In re Hilal*, 534 F.3d at 500 (quoting *In re Manges*, 29 F.3d at 1039). Dismissal on equitable-mootness grounds thus "rests on the need for finality, and the need for third parties to rely on that finality, in bankruptcy proceedings." *In re Grimland*, 243 F.3d at 231. Although equitable mootness is generally applied in the plan confirmation context, it may be applied in other situations where the relief requested would materially affect third parties, the success of a plaan, or have "substantial secondary effects." *See New Indus. V. Byman (In re Sneed Shipbuilding, Inc.)*, 914 F.3d 1000 (5th Cir. 2019) (leaving open the possibility that an appeal is equitably moot if a plan is "complex" and its "implementation has substantial secondary effects).

When determining whether an appeal should be dismissed as equitably moot, the Fifth Circuit has articulated a three-part inquiry: (1) whether a stay was obtained, (2) whether the plan has been "substantially consummated," and (3) whether the relief requested would affect either the rights of parties not before the court or the success of the plan. *Bank of New York Trust Co., NA v. Official Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229, 240 (5th Cir. 2009). All three of those factors demonstrate the equitable mootness of Appellants' appeal.

A.    <u>Appellants Did Not Obtain a Stay Pending Appeal.</u>

"The first question in a mootness inquiry is whether the appellants secured a stay to prevent execution of the Plan."  *In re Berryman Prods., Inc.*, 159 F.3d 941, 944 (5th Cir. 1998).  In that regard, it makes no difference whether Appellants tried to secure a stay; the only relevant issue is whether they actually obtained one. *Id.* (rejecting argument that the diligent but unsuccessful pursuit of stay is sufficient); *see also In re UNR Indus., Inc.*, 20 F.3d 766, 770 (7th Cir. 1994) ("A stay not sought, and a stay sought and denied, lead equally to the implementation of the plan of reorganization.")

Here, Appellants did not seek a stay of the Order, and no stay was granted. Appellants and the other Dondero Entities did seek a stay of the Confirmation Order, which is implicitly challenged by this appeal.  But their stay motions were denied, and the confirmed Plan was allowed to go effective and be consummated notwithstanding their pending appeals.

B.    <u>The Plan Has Been Substantially Consummated.</u>

The Bankruptcy Code defines "substantial consummation" as the "(A) transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by. . . the successor to the debtor. . . of the business or of management of all or substantially all of the property dealt with by the plan; and

17

(C) commencement of distribution under the plan." 11 U.S.C. § 1101(2).[20] Highland's plan has been substantially consummated.

*First*, all of the property of the Debtor's estate has been transferred to the Reorganized Debtor or Claimant Trust pursuant to the Plan. Ex. 6, Appx. 284. The Estate Claims (*i.e.*, certain causes of action that formerly belonged to the Debtor) have been transferred to the Litigation Sub-Trust. *Id*. The general and limited partnership interests of the Debtor have been extinguished. *Id.* The independent directors have all resigned their positions. *Id.*

*Second*, the Reorganized Debtor and Claimant Trust have completely taken over the management of Highland's business and former property for purposes of managing an orderly wind-down of its asset portfolios and making further distributions to creditors. *Id*. The new corporate ownership structure contemplated by the Plan has been put into place, and the Independent Managers have accepted their appointments. The Reorganized Debtor has issued partnership interests to its sole limited partner, the Claimant Trust, and to New GP, a wholly owned subsidiary of the Claimant Trust. *Id.* The Oversight Committee has been put into place and

---

[20] Substantial consummation is determined based on the extent of plan consummation at the time this Court reviews the mootness issue. *In re Manges*, 29 F.3d at 1041 ("Mootness is evaluated by the reviewing court, which may take notice of facts not available to the trial court if they go to the heart of the court's ability to review.").

18

has appointed Mr. Seery the Reorganized Debtor's chief executive officer, as trustee of the Claimant Trust. *Id.*

*Finally*, distributions to the Debtor's creditors are well underway. As set forth in detail in the Seery Declaration, the Reorganized Debtor has made distributions to various creditors, including Acis, Frontier, and various secured, tax and priority creditors in a total amount of approximately $2.8 million. *Id.*, Appx. 285. Cure payments totaling approximately $500,000 have been paid to counterparties under assumed executory contracts. *Id.*, Appx. 286. An additional $5.1 million has been distributed to the holders of Convenience Class claims, which represents the payment in full of 77% of such claims. *Id.*, Appx. 285.

And that's not all. The Reorganized Debtor also has issued an approximately $6 million new secured note to Frontier, as contemplated by the Plan, and entered into a $45 million fully-funded Exit Facility with Blue Torch, a U.S.-based middle market specialty lender. *Id.* Additionally, the Indemnity Trust has been created and funded with $2.5 million; the Reorganized Debtor, the Claimant Trust, and the Litigation Sub-Trust have also issued a $25 million note to the Indemnity Trust. *Id.*

All of these actions demonstrate the Plan's substantial consummation. This Court has explained that "the 'substantial consummation' yardstick" was adopted as part of the equitable-mootness analysis "because it informs our judgment as to when finality concerns and the reliance interests of third parties upon the plan as

effectuated have become paramount to a resolution of the dispute between the parties on appeal." *U.S. ex rel. FCC v. GWI PCS 1, Inc. (In re GWI PCS 1, Inc.)*, 230 F.3d 788, 801 (5th Cir. 2000) (citing *In re Manges*, 29 F.3d at 1041).  Here, the occurrence of substantial consummation of the Plan, as defined by the Bankruptcy Code, makes it more likely that the Plan's reversal or modification will "affect the success of the plan or alter the rights of third parties that have been achieved by its substantial consummation." *Ins. Subrogation Claimants v. U.S. Brass Corp. (In re U.S. Brass Corp.)*, 169 F.3d 957, 961 (5th Cir. 1999).  This is particularly true here because of the centrality of the Indemnity Trust to the Plan.

      C.      <u>Appellants' Requested Relief Would Impair the Plan's Success and the Rights of the Independent Managers and Others Relying on the Plan.</u>

Appellants argue that the Indemnity Trust is an impermissible plan modification.  At root, Appellants seek to (i) undermine the indemnification rights of the Independent Managers, who are carrying out the transactions contemplated by the Plan; (ii) cause the Independent Managers to resign for fear of future litigation; and (iii) derail the Plan.  Appellants real target through this appeal is the Plan, which includes the Plan Protections the Bankruptcy Court found to be "integral" and "necessary" to the Plan's success (Ex. 2, Appx. 53-54).  Ultimately, reversal of the Order, will result in resignation of the Independent Managers, put future distributions to creditors in jeopardy, and upend the reorganization with no guarantee that a new, confirmable plan could emerge.

20

The Plan Protections, the Bankruptcy Court correctly recognized, are critical to the Independent Managers' willingness to support and participate in the post-Effective Date implementation and consummation of the Plan, and to the success of the wind-down effort. *See* Ex. 2, Appx. 60-63.[21]  Similarly, the Indemnity Trust is a necessary component of the Plan and a corollary to the Plan Protections.  It secures the Indemnification Obligations and ensures sufficient resources exist to fund those obligations – obligations which will almost certainly be triggered because of Mr. Dondero's litigiousness.   Like the Plan Protections, the Independent Managers would have been unwilling to participate in the implementation and consummation of the Plan without the Indemnity Trust and will resign if the protections provided by the Indemnity Trust cease to exist.

Granting the appeal, therefore, jeopardizes the Plan.  It also undermines the reasonable reliance of not only the Independent Managers,[22] but Blue Torch and the creditors who have already begun receiving distribution, and could result in the claw back of the nearly $10 million that has already been distributed.

Importantly, Appellants seeking this chaotic return to bankruptcy have no meaningful financial stake in obtaining such an outcome.  As the Bankruptcy Court

---

[21] Appellants did not challenge these findings in their appeals of the Confirmation Order.

[22] The risk to the Independent Managers is not theoretical.  They already acted in reliance on the Order when they substantially consummated the Plan, and it is beyond doubt that these individuals will be sued by Mr. Dondero and his controlled entities for those actions even if they resign.

21

found, "the remoteness of [Appellants'] economic interests is noteworthy" and raises serious "questions" about Appellants' "good faith" in objecting to the Plan (and, now, pursuing these appeals).  Ex. 2, Appx. 22-23.  Appellants' challenge to the Indemnity Trust (and backdoor challenge to the Confirmation Order) are not designed to vindicate some perceived economic rights that allegedly were trampled by the confirmed Plan or the Indemnity Trust.  Rather, it is the Plan's unravelling— full stop—that Appellants are really after.  They are, the Bankruptcy Court had "good reason to believe," acting merely as "disruptors."  Ex. 2, Appx. 23.  Appellants evidently *want* to bring about the turmoil that would follow the upending of the consummated Plan.  Perhaps they have designs on somehow managing to rise from those ashes with Mr. Dondero back in control of the estate's assets and its causes of action (including the potential causes of action against Appellants).  Or perhaps they are simply making good on Mr. Dondero's explicit threat to "burn the place down" once he was prevented from retaking control.

## CONCLUSION

For the foregoing reasons, the appeal should be dismissed as equitably moot.

Dated:  October 15, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No. 143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        ikharasch@pszjlaw.com
        jmorris@pszjlaw.com
        gdemo@pszjlaw.com
        hwinograd@pszjlaw.com


-and-

**HAYWARD PLLC**
*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

DOCS_NY:44238.9 36027/003

## CERTIFICATE OF COMPLIANCE WITH RULE 8013

The undersigned hereby certifies that this Motion complies with the type-volume limitation set by Rule 8013(f)(3) of the Federal Rules of Bankruptcy Procedure.  This Motion contains 5,143 words.

*/s/ Zachery Z. Annable*

Zachery Z. Annable

## **CERTIFICATE OF SERVICE**

I hereby certify that, on October 15, 2021, a true and correct copy of the foregoing Motion was served electronically upon all parties registered to receive electronic notice in this case via the Court's CM/ECF system.

*/s/ Zachery Z. Annable*
Zachery Z. Annable